# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) MARY COLBERT and | ) | |
| (2) LARRY COLBERT, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 12-CV-466-JHP |
| | ) | |
| UNITED STATES OF AMERICA ex rel. | ) | |
| CHICKASAW NATION MEDICAL | ) | |
| CENTER, | ) | |
| Defendant. | ) | |

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

Mary Colbert had a total abdominal hysterectomy at the Chickasaw Nation Medical Center (hereinafter "CNMC") on September 7, 2010. The procedure was performed by Dr. Neill Taylor, an employee of the CNMC. During the procedure, Ms. Colbert's ureter was completely transected. Prior to the procedure, Ms. Colbert was advised that damage to surrounding structures, which include the ureters, was a known complication and that such complications may result in the need for further surgeries. The fact that Ms. Colbert's ureter was transected did not fall below the standard of care and did not constitute negligence. Therefore, the Defendant is not responsible for any damage that occurred due to the injury to the ureter during the hysterectomy or the additional surgeries she underwent following the repair.

The Defendant presented testimony that the ureter could not be visualized at the location where it was transected and that injuries to the ureter in that location are often not recognized. The Defendant also presented testimony that the ureter likely could not have been repaired at CNMC even if the injury had been recognized during the surgery, and that for the two days while Ms. Colbert was in the hospital the injury was not exacerbated. Any delay did not cause further

injury to Ms. Colbert. The Defendant also presented testimony that the decision regarding surgery to repair the ureter was made by Dr. Glen Diacon, and his choice of end-to-end repair was below the standard of care and made strictures more likely. Dr. Diacon's negligence constituted a superseding cause for Ms. Colbert's injuries.

**<u>Findings of Fact</u>**

**A. The Events**

1.  On August 6, 2010, 56-year-old Mary Colbert was evaluated at the Same-Day Clinic at Chickasaw Nation Medical Center (hereinafter "CNMC") for complaints of abdominal bloating and intermittent abdominal pain over the course of four weeks. (DEF.TR. EX. 1, PG. 172)[1]

2.  The Same-Day Clinic staff determined that Ms. Colbert had an ovarian mass and referred her to gynecologist, Dr. Neill Taylor, for follow-up. (DEF.TR. EX. 1, PG. 172)

3.  On August 23, 2010, Ms. Colbert saw Dr. Taylor at CNMC. (DEF.TR. EX. 1, PG. 167-168)

4.  During the consultation, she advised Dr. Taylor of "some" abdominal pain, loss of appetite, and bloating, which had begun to occur over the last couple months. (DEF.TR. EX 1, PG. 167-168)

5.  Dr. Taylor reviewed an ultrasound, which revealed a large, complex, pelvic mass, measuring approximately 16.9 x 10 x 12.1 cm. (DEF.TR. EX. 1, PG. 167- 168)

6.  Ms. Colbert's CA-125 test came back normal. (DEF.TR. EX. 1, PG. 167 – 168)

7.  At that point, Dr. Taylor recommended that Ms. Colbert undergo a total abdominal hysterectomy with bilateral salpingo-oophorectomy ("TAHBSO"). (DEF.TR. EX. 1, PG. 168)

---

[1] Exhibits admitted at trial will be referenced by Defendant's or Plaintiff's Trial Exhibit followed by the exhibit number and page number. (DEF.TR. EX. ___, PG.___)

8.      During the appointment, Dr. Taylor scheduled Ms. Colbert's surgery for removal of the mass and spent 25 minutes counseling Plaintiffs and their daughter about the surgery, including the associated risks.  (DEF.TR. EX. 1, PG. 168)

9.      Dr. Taylor advised that with the procedure there was the risk of injury to nearby structures.  (DEF.TR. EX. 1, PG. 299-300)

10.     Dr. Taylor also counseled Plaintiffs that it was possible future surgical procedures of a greater magnitude could be necessary. (DEF.TR. EX. 1, PG. 299-300)

11.     On September 7, 2010, Ms. Colbert had the TAHBSO procedure under general anesthesia.  (DEF.TR. EX. 1, PG. 296-298)

12.     Dr. Taylor served as the operating physician, and Dr. Richard McClain served as the surgical assistant. (DEF.TR. EX. 1, PG. 296)

13.     Dr. McClain is a board certified OBGYN who served as chief medical officer for the Chickasaw Nation Medical Center. (TR.TRA. PG. 426 L. 3-9)[2]

14.     Dr. Taylor and Dr. McClain have performed hundreds of procedures together.  (TR.TRA. PG. 426 L. 10-13)

15.     During surgery, Dr. Taylor found the large abdominal mass as expected. (DEF.TR. EX. 1, PG. 296-298)

16.     Because the abdominal anatomy was out of position, it left the right ureter[3] in a very vulnerable position that made it more challenging to remove the mass and not injure the ureter.  (TR.TRA. PG. 524 L. 18 – PG. 525 L. 13)

17.     Unlike the right ureter, the left ureter (which was injured in this case) was not in a vulnerable position.  (TR.TRA. PG. 435 L. 7 – PG. 436 L. 5; TR.TRA. PG. 559 L. 5 – 10)

18.     The broad ligament[4] was dissected on the left side, allowing Dr. Taylor to identify the left ureter.  (DEF.TR. EX. 1, PG. 297;  TR.TRA. PG. 428 L. 7- PG. 429 L. 7)

_____

[2] The Trial Transcript will be referred by TR.TRA. followed by the page number and line.  (TR.TRA. PG.___ L. __ )

[3] The ureter is the tube that conducts the urine from the renal pelvis to the bladder. STEDMAN'S MEDICAL DICTIONARY 2071 (28th ed. 2006).

19.     The ureter can only be identified visually down to an area where it dives under the uterine artery. (TR.TRA. PG. 425 L. 11-19; TR.TRA. PG. 278 L. 4-8)

20.     In this case Dr. Taylor visualized the left ureter until it was no longer visible. The injury to Ms. Colbert's ureter occurred where it was not visible. (TR.TRA. PG. 425 L. 11 – 23; TR.TRA. PG. 428 L.17- PG. 429 L.7)

21.     Gynecologists are trained to minimize ureteral injuries to this area by using clamps that are placed close to the cervix taking small bites and avoiding areas where they know the ureter is located.   (TR.TRA. PG. 425 L. 2-10; TR.TRA. PG. 279 L. 5-14)

22.     Once Dr. Taylor had visually identified both ureters as far as possible, he removed the mass, uterus, ovaries, and fallopian tubes.  (TR.TRA. PG. 428 L. 7 – 25; DEF.TR. EX. 1, PG. 297-299)

23.     Dr. Taylor closed the skin with skin staples and sent Ms. Colbert to the recovery room. (DEF.TR. EX. 1, PG. 298)

24.     Ten minutes before the surgery ended, the anesthesiologist indicated there was "blood tinged urine noted in the Foley tubing-surgeons aware." (DEF.TR. EX. 1, PG. 302)

25.     There is a difference between bloody urine and blood-tinged urine.  (TR.TRA. PG. 285 L. 2 – 9; TR.TRA. PG. 46 L. 5 - PG. 47 L. 16)

26.     Bloody urine looks like blood. Blood-tinged urine is not unusual in hysterectomies. (TR.TRA. PG. 285 L 2 – 9)

27.     While the medical records indicate there was blood-tinged urine in the Foley tubing, that is not unusual after a total abdominal hysterectomy. (TR.TRA. PG. 437 L. 13 – 16; TR.TRA. PG. 284, L. 3 - 12)

28.     There will be blood-tinged urine in the Foley after total abdominal hysterectomy in most cases.  (TR.TRA. PG. 285 L. 2 – 9)

---

[4] The broad ligament of the uterus is the ligament that supports the uterus, ovaries, and fallopian tubes. STEDMAN'S MEDICAL DICTIONARY 1082 (28th ed. 2006)

29. The reason for blood-tinged urine is that during a hysterectomy the bladder is being manipulated, which can cause minimal bleeding from the bladder. (TR.TRA. PG. 283, L. 18 – PG. 284, L. 6; TR.TRA. PG. 436 L.10 – PG. 437 L. 19)

30. Dr. Taylor investigated the issue of bleeding, and when he saw Ms. Colbert after the surgery he looked for any bleeding vaginally. (TR.TRA. PG. 443 L. 12-16)

31. During the three days following surgery, the medical records reflect there was no blood in the urine. (DEF.TR. EX. 1, PG. 288, 303, 310-318)

32. The procedure concluded at 9:56 a.m. The nurses recorded under Remarks & Signature, no bleeding in the Foley catheter during the first five hours following surgery. (DEF.TR. EX. 1, PG. 318)

33. At 8:35 p.m. the day of surgery the nurses note at focal assessment that she was continuing to show "Foley with yellow urine." (DEF.TR. EX. 1, PG. 314)

34. Except for the one notation of "blood tinged urine in Foley tubing" during the surgery, there is no other mention of blood in the urine following Ms. Colbert's hysterectomy. (DEF.TR. EX. 1, PG. 276 – 343; TR.TRA. PG. 216 L. 23 - PG. 217 L. 3)

35. The medical records indicate Ms. Colbert's pain fluctuated, as would be expected, from no pain to higher levels of pain following her surgery. (DEF.TR. EX. 1, PG. 288, 303, 310-318, 336-338)

36. Dr. Taylor made rounds twice a day and examined Ms. Colbert including doing testing to determine what if any pain she was having and where it was located. (TR.TRA. PG. 439 L. 7-13; PG. 444 L. 22 – PG. 447 L.2)

37. The pain Ms. Colbert was having was documented by the nurses in the medical records. (DEF.TR. EX. 1, PG. 288, 303, 310-318, 336-338)

38. Her pain on the day of surgery was recorded by the nurses as 10 out of 10. (DEF.TR. EX.1, PG. 337)

39. The day following surgery the pain was recorded by the nurses as 3 out of 10. (DEF.TR. EX. 1, PG. 337)

40. Dr. Taylor believed the pain was in her chest and was possibly from her lungs. (DEF.TR. EX. 1, PG. 162; TR.TRA. PG. 460, L. 17-19)

41. In order to determine if that was where the pain was coming from, Dr. Taylor did tests, including x-rays. (DEF.TR. EX. 1, PG. 162; TR.TRA. PG. 458 L. 6- PG. 460 L. 19)

42. The x-ray results showed emphysematous change and some atelectasis. (DEF.TR. EX. 1, PG. 215; TR.TRA. PG. 461 L. 2 – 9)

43. Ms. Colbert was discharged from the hospital on September 9, 2010. She was scheduled for an appointment to remove her staples on September 14, 2010. (DEF.TR. EX. 1, PG. 280, 340)

44. The medical records reflect that Ms. Colbert contacted the hospital on one occasion between the time she was discharged on September 9, 2010 and her follow-up appointment on September 14, 2010. (DEF.TR. EX. 1, PG. 161-162; 276-340)

45. Ms. Colbert contacted the hospital to ask that they change her medication because it was making her sick. (DEF.TR. EX. 1, PG. 163-164)

46. On September 14, 2010, Ms. Colbert returned for a pre-scheduled follow-up appointment with Dr. Taylor for staple removal. (DEF.TR. EX. 1, PG. 161-162)

47. At that visit Ms. Colbert complained of pain on her left side. (DEF.TR. EX. 1, PG. 161)

48. Dr. Taylor believed further studies were necessary because the pain from atelectasis should have resolved by that time. (DEF.TR. EX. 1, PG. 162)

49. Dr. Taylor performed an ultrasound, which revealed moderate dilation of the left renal pyelus[5] and proximal ureter. (DEF.TR. EX. 1, PG. 162)

50. This led Dr. Taylor to suspect injury to the left ureter, and he immediately referred her to Dr. Glen Diacon, a urologist at Southern Oklahoma Urology, Inc., for further care. (DEF.TR. EX. 1, PG. 162)

51. On September 15, 2010, Ms. Colbert visited Dr. Diacon. (DEF.TR. EX. 4, PG. 201)

52. He performed a cystoscopy,[6] retrograde pyelogram,[7] a balloon dilation, and attempted a stent placement with ureteroscopy[8]. (DEF.TR. EX. 4, PG. 310-311)

---

[5] A flattened funnel-shaped expansion of the upper end of the ureter. STEDMAN'S MEDICAL DICTIONARY 1449 (28th ed. 2006).

[6] The inspection of the interior of the bladder using a cystoscope. STEDMAN'S MEDICAL DICTIONARY 486 (28th ed. 2006). A cystoscope is a lighted tubular endoscope for examining the interior of the

53. During this procedure, he determined that Ms. Colbert had suffered injury to the left ureter, which was completely obstructed. (DEF.TR. EX. 4, PG. 310-311)

54. On September 16, 2010, Dr. Diacon performed an exploratory laparotomy.[9] (DEF.TR. EX. 4, PG. 232-233)

55. During the surgery, Ms. Colbert underwent a primary ureteroureterostomy[10] and cystoscopy with a left double-J stent[11] placement and left ureteroscopy. (DEF.TR. EX. 4, PG. 232-233)

56. Dr. Diacon found that a free tie (a stitch) had been placed around the left ureter during the September 7, 2010 surgery, which he fixed. (DEF.TR. EX. 4, PG. 232-233; TR.TRA. PG. 79 L.1-81 L. 2)

57. Since the September 16, 2010 procedure, Ms. Colbert has undergone follow-up procedures for strictures that formed following her left ureteral repair. (DEF.TR. EX. 4, PG. 1-215)

## B. The Witnesses

### 1. Dr. Neill Taylor, M.D.

58. Dr. Taylor is a retired obstetrician gynecologist and physician in Jefferson, Georgia. (TR.TRA. PG. 416 L. 9-14)

59. Dr. Taylor attended Georgia Tech and the University of Georgia for undergraduate school and the Medical College of Georgia for medical school. (TR.TRA. PG. 416 L. 22- PG. 417 L. 1)

---

bladder. *Id.*

[7] A radiograph or series of radiographs of the renal pelvis and ureters, following administration of a contrast medium. STEDMAN'S MEDICAL DICTIONARY 1608 (28th ed. 2006).

[8] This is an examination of the urinary tract using an ureteroscope. *Cystoscopy and Ureteroscopy* (Mar. 28, 2012), http://kidney.niddk.nih.gov/kudiseases/pubs/cystoscopy/#whatisu.

[9] An incision through the loin. STEDMAN'S MEDICAL DICTIONARY 1048 (28th ed. 2006).

[10] The establishment of "communication" between two segments of the same ureter. STEDMAN'S MEDICAL DICTIONARY 74–75, 2072 (28th ed. 2006).

[11] A double-J stent is a thin, bendable tube threaded into the ureter to assist urine drain in the kidney towards the bladder. *Ureteral stenting Double J Stenting*, http://www.laparoscopyhospital.com/ureteral-stenting.html.

60.     Dr. Taylor performed his Obstetric Gynecology Residency through the military at William Beaumont Army Medical Center in El Paso, Texas and finished his military obligation at Ft. Benning in Columbus Georgia. (TR.TRA. PG. 417 L.1 – 10)

61.     Dr. Taylor was board certified in OBGYN in 1983 and entered into private practice as a general OBGYN in Americus, Georgia, where he practiced at least 16 years. (TR.TRA. PG. 417 L.18-24)

62.     He is licensed to practice medicine in Georgia and Oklahoma. (TR.TRA. PG. 418 L. 2-6)

63.     For the first 11 years of his practice, Dr. Taylor practiced obstetrics and gynecology and for the last five years practiced gynecology only. (TR.TRA. PG. 418 L. 7-13)

64.     After 16 years Dr. Taylor closed his practice and went to Thailand for two and one-half years on behalf of the International Mission Board of the Southern Baptist Convention. For the first two years he worked in a Baptist Hospital in semi-rural Thailand as a staff physician/obstetrician/gynecologist receiving only a stipend and for the last six months was in Northern Thailand to assist in establishing an English language school. (TR.TRA. PG. 418 L. 14 – PG. 419 L. 13)

65.     Dr. Taylor returned to the United States in 2002 and engaged in private practice performing gynecological surgery. (TR.TRA. PG. 420 L. 3 – PG. 421 L. 8)

66.     In early 2006, Dr. Taylor went to work at the Chickasaw Nation Hospital as an obstetrician/gynecologist and practiced there until retiring from the medical profession in September of 2012. (TR.TRA. PG. 421 L. 9 – 19)

## 2. Plaintiffs' Expert Dr. Michael Hall, M.D.

67.     Plaintiffs' Expert Gynecologist, Dr. Michael Hall, M.D. testifies in medical malpractice cases only for plaintiffs. (TR.TRA. PG. 175 L. 3-8)

68.     Dr. Hall has never testified as an expert on behalf of a physician or hospital. (TR.TRA. PG. 175 L. 6-11)

69.     In 2009 Dr. Hall's "income percentage from medical/legal work was approximately 50%." (TR.TRA. PG. 176 L. 20-22)

70.   Dr. Hall advertises in order to obtain work as an expert. (TR.TRA. PG. 176 L. 23-24)

71.   Dr. Hall does not perform ureteral repairs. (TR.TRA. PG. 181 L. 25 – PG. 182 L. 2)

72.   Dr. Hall is not trained as a urologist. (TR.TRA. PG. 128 L. 18-20)

73.   Dr. Hall has not been trained to do an end-to-end repair of the ureter. (TR.TRA. PG. 129 L. 3-10)

74.   Dr. Hall has not been trained to do any repair to an injured ureter, including attaching the ureter to the bladder or reimplantation. (TR.TRA. PG. 129 L. 11-18)

75.   Dr. Hall served for 10 years on a review board for a hospital. His experience on the review board allowed him to see and to follow cases where complications, bad outcomes, and malpractice had occurred. (TR.TRA. PG. 122 L. 1 – PG. 125 L. 9).

76.   Dr. Hall's opinion that patients who have end-to-end repair, the procedure that was performed by Dr. Diacon in this case, have better outcomes than reimplantation in the bladder is inconsistent with the textbook "TeLinde's Operative Gynecology," Tenth Edition ("TeLinde's"). (TR.TRA. PG.178 L. 18 – PG. 181 L. 21)

77.   TeLinde's states that the standard repair following ureteral transection within six centimeters of the bladder, as was the injury in this case, is to reattach the ureter to the bladder. (TR.TRA. PG.178 L. 12 – PG. 182 L. 2)

78.   TeLinde's is a text book that Dr. Hall would go to if he needed an answer to a question related to gynecology or surgery. (TR.TRA. PG. 178 L. 18- 24)

79.   Dr. Hall stated that TeLinde's is a very good reference that is used if one is doing gynecological surgery. (TR.TRA. PG. 184 L. 20-23)

80.   Dr. Hall provided a portion of TeLinde's textbook to support his written expert report in this case. (TR.TRA. PG. 179 L.15 – 18)

81.   Dr. Hall, who is an OBGYN, disagrees with the opinion of Dr. Diacon, who is a urologist, that a delay of one week in diagnosing a ureteral injury is not below the standard of care. (TR.TRA. PG. 201 L. 21- 25)

82.     However, Dr. Hall agrees that Dr. Diacon would know more about how a delay would affect a repair since Dr. Diacon performs the ureteral repairs. (TR.TRA. PG. 202 L. 1 -7)

### 3.   Plaintiffs' Expert Dr. Glen Diacon, M.D.

83.     Dr. Glen Diacon, M.D. is a urologist in Ada, Oklahoma. (TR.TRA. PG. 67 L. 1 – 21)

84.     Dr. Diacon has a business relationship with Plaintiffs' counsel, George Braly. (TR.TRA. PG. 621 L. 4-5)

85.     They are partners in a business, Tornado Alley Turbo.  (TR.TRA. PG. 621 L. 6-11)

86.     Dr. Diacon is the only urologist in Ada, Oklahoma. (TR.TRA. PG. 67 L. 22-24)

87.     Dr. Diacon has no partners and works solely with a physicians assistant. (TR.TRA. PG. 67 L. 11-17)

88.     Dr. Diacon does not believe he is qualified to give opinions regarding the standard of care of a gynecologist, including whether the failure to identify clearly the ureters and the delay of diagnosis of injury to the ureters fell below the standard of care. (TR.TRA. PG. 622 L. 25- PG. 623 L. 21)

89.     Dr. Diacon has never done a ureteral repair at the CNMC because they do not have the necessary equipment to perform a ureteral repair. (TR.TRA. PG. 591 L. 10-23)

90.     The CNMC did not have the equipment that would likely be necessary to repair Ms. Colbert's ureter injury, so the repair could not have been done there most likely. (TR.TRA. PG. 591, L. 15-23)

91.     Dr. Diacon has performed more reimplantations of ureters into the bladder than reattaching the ureter end-to end. (TR.TRA. PG. 97 L. 5 - 10)

92.     Dr. Diacon provided the opinion that blood in the urine observed toward the end of pelvic surgery should be investigated. (TR.TRA. PG. 114 L. 1 – 7)

93.     Dr. Diacon cannot testify that he knows that a delay of one week in diagnosing a ureteral injury is below the standard of care in gynocology.  (TR.TRA. PG. 623 L. 13 - 18)

94.     The scarring from the pelvic wall made it more difficult to locate the distal portion of the ureter, but after locating it the repair was pretty easy.  (TR.TRA. PG. 614 L. 1-25 - P. 615 L. 1)

95.     Dr. Diacon believes it is normal to have strictures after ureteral repair.  (TR.TRA. PG. 617 L. 3 - 8)

96.     Dr. Diacon believes that after ureteral repair, it is normal to have a stricture every two or three months, then every six months, then every year, and then finally for the ureter to stay open. That normal course was the case with Ms. Colbert. (TR.TRA. PG. 625 L. 24 - PG. 626 L.6)

97.     Dr. Diacon does not feel comfortable giving an opinion about what a gynecologist should do if they see blood in the Foley after a hysterectomy. (TR.TRA. PG. 627 L. 3 - 12)

**4.  Defendant's Expert Dr. Larry Paul Griffin, M.D.**

98.     Dr. Larry Paul Griffin, M.D. is an Obstetrician/Gynecologist practicing in Louisville, Kentucky. (TR.TRA. PG. 269 L.8 – 14)

99.     Dr. Griffin attended undergraduate and medical school at the University of Louisville and performed his OBGYN residency and fellowship at Maternal and Family Medicine at the University of Louisville. (TR.TRA. PG. 269 L. 15 – 21)

100.    Dr. Griffin became board certified in OBGYN and has had an active board certification since that time. (TR.TRA. PG. 269 L.21 – 24)

101.    Dr. Griffin is in private practice in Louisville, Kentucky practicing in general obstetrics and gynecology with a group of five other OBGYNs. (TR.TRA. PG. 270 L. 12 – 20)

102.    He is currently a clinical professor at the University of Louisville and a clinical associate professor at the University of Kentucky Medical Schools. (TR.TRA. PG. 270 L. 21 – 25)

103.    Dr. Griffin has been the Kentucky state section chair with the American College of OBGYN ("ACOG") and also the district officer, vice-chair and then chair-elect of the Kentucky section of ACOG.  He has also served on the national committees and

commissions of ACOG, and then served as one of the five full time staff directors in Washington, DC at ACOG. (TR.TRA. PG. 271 L. 1 – 10)

104.     Dr. Griffin served as a Naval Medical Corp Reserve Officer from 1984–2007. (TR.TRA. PG.  271 L. 11 – 16)

105.     Dr. Griffin has served in private practice as an OBGYN since 1977 and has treated hundreds of women with ovarian masses. (TR.TRA. PG. 271 L.21 – PG. 272 L. 2)

106.     Dr. Griffin does total hysterectomies two or three times a month and has treated females who have presented with large masses which required major surgeries six or seven times a year.  (TR.TRA. PG. 272 L. 12 – 21)

107.     Dr. Griffin, unlike Plaintiffs' expert Dr. Hall, has had patients on more than one occasion who had to have ureteral repairs and followed those patients after the repair. (TR.TRA. PG. 297 18 – PG. 298 L. 4)

108.     Frequently those patients had strictures that formed after the repair, as did Ms. Colbert, and most frequently those healed completely.  (TR.TRA. PG. 298 L. 5 -17)

### 5.  Defendant's Expert Dr. Niall Thomas McLaren Galloway, M.D.

109.     Dr. Niall Thomas McLaren Galloway, M.D. is a urologist practicing at the Emory University School of Medicine in Atlanta at the Emory Clinic.  (TR.TRA. PG. 354 L. 3 – 10)

110.     Dr. Galloway is the medical director of the incontinence center and is responsible for female urology. (TR.TRA. PG. 354 L. 10 – 12)

111.     Dr. Galloway attended the University of Aberdeen Medical School in Scotland from 1968 to 1974.  (TR.TRA. PG. 354 L. 13 – 18)

112.     Dr. Galloway performed his internship in Edinburgh and also taught anatomy at the University of Edinburgh. (TR.TRA. PG. 354 L. 19-23)

113.     His residency training was in surgery in Bath, England. (TR.TRA. PG. 354 L. 24  - PG. 355 L. 2)

114.     Dr. Galloway received the John Hunter Award for surgery at Aberdeen and was awarded a fellowship from the College of Surgeons of England and also at Edinburgh

was awarded a traveling scholarship by the Welsh Urological Association that allowed him to come to Duke in North Carolina in 1986.  (TR.TRA. PG. 355 L. 3 – 19)

115. Dr. Galloway is a United States citizen and moved to Emory School of Medicine in Atlanta in 1988.  (TR.TRA. PG. 355 L. 20 – 24)

116. Dr. Galloway's current practice consists of a clinical practice which consists of about 85 percent female patients. He is also responsible for the urological aspect of the uro-gynecology training at Emory University School of Medicine.  (TR.TRA. PG. 356 L. 11 – 22)

117. Much of the work Dr. Galloway does is related to problems similar to Ms. Colbert's, in that Emory is a referral center for complications and much of Dr. Galloway's reconstructive practice has to do with complications, such as fistula repair after hysterectomy and reimplantations of obstructed ureters.  (TR.TRA. PG. 356 L. 23 – PG. 357 L. 8)

118. Dr. Galloway regularly performs ureteral repairs.  (TR.TRA. PG. 357 L. 9 – 10)

## C.  The Applicable Standards of Care and Related Factual Findings

119. All experts agree that injury to the ureter during the hysterectomy was a known complication even in the absence of any deviation from the acceptable standard of care. (TR.TRA. PG. 184 L. 23 – PG. 185 L.1; TR.TRA. PG.  623 L. 8 – 12; TR.TRA. PG. 277 L. 1 – 8)

120. Ms. Colbert signed a consent form prior to the hysterectomy which disclosed the possibility of injury to "nearby structures" and "possible larger or later surgeries, if needed." The ureter is a nearby structure. (TR.TRA. PG.189 L. 22 – PG. 191 L. 8; DEF.TR. EX. 1, PG. 299-300)

121. Ureteral injury occurs in one to three percent of major abdominal hysterectomy cases in the absence of any deviation from the standard of care. (TR.TRA. PG. 277 L. 1 – 8)

122. The standard of care does not require that a cystoscopy be done after each hysterectomy. (TR.TRA. PG. 589 L. 19 – PG. 590 L. 2; TR.TRA. PG. 626 L. 20 – 25)

123. The standard of care would require a cystoscopy during an open hysterectomy only if there were a heightened degree of suspicion of injury to the ureter.  (TR.TRA. PG. 283 L.8 – 16; TR.TRA. PG. 281 L. 11 – 16; TR.TRA. PG. 191 L. 20 -24)

124.    In this case there was no indication of or reason for a suspicion of an injury to the ureter. (TR.TRA. PG. 434 L. 19-21; TR.TRA. PG. 286 L. 17 – 23)

125.    The fact that there was blood-tinged urine in the Foley following surgery is not sufficient to create a heightened suspicion of injury to the ureter. (TR.TRA. PG. 436 L. 10 – PG. 437 L. 23; TR.TRA. PG. 283 L. 8-16)

126.    Blood in urine is not the same as blood-tinged urine.  (TR.TRA. PG. 543 L. 3 – 15)

127.    The presence of blood-tinged urine in the Foley is extremely common after hysterectomy. (TR.TRA. PG. 284 L. 1-12; TR.TRA. PG. 436 L. 10 – 20)

128.    Blood-tinged urine results from mild trauma to the bladder which occurs routinely during the dissection of the bladder from the lower portion of the uterus (TR.TRA. PG. 283 L. 21 – PG. 284 L. 10; TR.TRA. PG. 436 L. 10 – 437 L. 19)

129.    In abdominal hysterectomies the physician is required to separate the tissues and use retraction in the entire lower part of the hysterectomy.  The removal of the cervix requires that a curled metal retractor be used to pull on the underneath side of the bladder to visualize where the surgeon needs to complete the hysterectomy.  (TR.TRA. PG. 436 L. 17 – PG. 437 L. 1; TR.TRA. PG. 283 L. 21 – PG. 284 L. 10)

130.    If a surgeon cut or stitched a ureter, the surgeon would not expect to see bleeding or blood-tinged urine.  (TR.TRA. PG. 285 L. 10 -15)

131.    First, there is not much blood in the ureter.  (TR.TRA. PG. 285 L. 21 – 24)

132.    Seeing blood in the urine does not make physiological sense because if a surgeon cut or stitched around the ureter the blood is not going to get into the bladder to ultimately end up in the urine.  (TR.TRA. PG. 285 L. 10 – 19)

133.    The reason is that when the surgeon cuts or stitches the ureter, it is blocked.  There is no way for the blood from the injury to come down the ureter because it is tied off. (TR.TRA. PG. 285 L. 10 – PG. 286 L. 1)

134.    The standard of care when blood-tinged urine is recognized in the Foley tubing during an abdominal hysterectomy requires the patient be observed to determine whether the urine clears.  (TR.TRA. PG. 283 L. 11 – PG. 284 L. 23)

135.    Ms. Colbert's urine showed no blood in the immediate post-operative period on September 7th, the day of surgery (DEF.TR. EX.1 PG. 318) (Remarks and Signature)

136.    At no time was there any indication of bleeding or blood in the urine after the "blood-tinged urine" was noted in the anesthetic record during surgery.  (TR.TRA. PG. 216 L. 23 – PG. 217 L. 4)

137.    When Dr. Taylor saw Ms. Colbert after the surgery one of the things he looked for was if she was having any bleeding vaginally, and at no time during her stay following the surgery was there any indication of blood in the urine. (TR.TRA. PG. 443 L. 7 – 20)

138.    Plaintiffs' expert, Dr. Hall, is of the opinion that if Dr. Taylor failed to evaluate Ms. Colbert's pain during her stay in the hospital, that would be below the standard of care. (TR.TRA. PG. 159 L. 9-20)

139.    The medical records indicate that Ms. Colbert's pain was recorded in the medical records almost every hour during her stay at the Chickasaw Nation Hospital. (DEF.TR. EX. 1, PG. 310-318)

140.    Dr. Taylor saw Ms. Colbert at least twice a day during her hospital stay. (TR.TRA. PG. 438 L. 13 – 15)

141.    On each of the visits before seeing Ms. Colbert, Dr. Taylor would review the medical records to determine the vital signs, review any testing information that may have been available, and also, speak with the nurses who had been caring for her.  (TR.TRA. PG.442 L. 21 – PG. 443 L. 5)

142.    During Ms. Colbert's immediate post-operative care, between 11:20 a.m. and 3:45 p.m., Ms. Colbert rated her pain as being 10 out of 10 at 1120, 10 out of 10 at 1152, 2 out of 10 at 1229, 3 out of 10 at 1347, 3 out of 10 at 1446, 2 out of 10 at 1545 and 5 out of 10 and 5 out of 10 at 1643. (DEF.TR. EX.1, PG. 318)

143.    Ms. Colbert's pain assessment record on September 7th and the early morning of September 8th indicated her pain was in her abdomen, and her pain fluctuated from 4 to 5 to 4 to 3 to 0 to 0 to 2 to 2.  (DEF.TR. EX.1, PG. 315) (PAIN ASSESSMENT)

144.    On September 8th at 8:15 a.m. Dr. Taylor ordered the automatic pain control ("APC") be stopped and oral meds be given for pain. (DEF.TR. EX.1, PG. 316)

145.    When the APC was removed on September 8th, Ms. Colbert complained of pain but by 1355 on September 8th Ms. Colbert's pain was recorded as 6 out of 10 and patient stated "pain is much better," and at 1615 it was noted that patient "request no pain meds at this time."  (DEF.TR. EX.1, PG. 316 – 317)

146.    Late on September 8th through the morning of September 9th, the day of discharge, Ms. Colbert's pain was noted on five occasions in her abdomen and on two occasions in her hip, and the pain was rated as 3,3,5,4,3,4, and 3. (DEF.TR. EX.1, PG. 313)

147. Ms. Colbert stated the heat pack to her hips helped with pain. (DEF.TR. EX.1, PG. 313)

148. Contrary to the statement of Plaintiffs' expert Dr. Hall, who says there was no recording in the medical records of Dr. Taylor indicating he had ever evaluated Ms. Colbert's pain, (TR.TRA. PG. 159 L. 21 – PG. 160 L. 1), the medical records reflect that Dr. Taylor evaluated Ms. Colbert's pain on two separate occasions on both post-op days. (DEF.TR. EX.1, PG. 281 and 288)

149. Dr. Hall indicated that it was below the standard of care to have a patient with 10-out-of-10 pain and send her home without evaluating that pain. (TR.TRA. PG. 159 L. 9 – 20)

150. On September 9th, before discharge, after she stated she was having 10-out-of-10 pain, the medical records and Dr. Taylor's testimony are clear that he did evaluate Ms. Colbert's pain. (DEF. EX.1, PG 281, 288)(TR.TRA. PG. 457 L. 24 – PG. 459 L. 24)

151. Dr. Taylor ordered an EKG and chest x-ray after discussing Ms. Colbert's pain with her on the day of discharge. (DEF. EX. 1, PG. 281, 288; TR.TRA. PG. 457 L. 3 – 6)

152. Dr. Taylor made these orders because he believed her pain was related to "chest pains and questionable atelectasis." (DEF. EX. 1, PG. 281, 288; TR.TRA. PG. 458 L. 3 – 10)

153. Dr. Taylor does not typically order x-rays before discharging a patient after hysterectomy but did so in this case to evaluate Ms. Colbert's 10-out-of-10 pain. (TR.TRA. PG. 462 – L. 1 – 10)

154. The x-ray indicated emphysematous change and some atelectasis. (TR.TRA. PG. 460 L. 25 – PG. 461 L. 1)

155. Atelectasis is blockage of small segments of the lower part of the lungs because of the inability to breathe deeply following surgery. (TR.TRA. PG. 458 L. 11 – 22)

156. Atelectasis can cause pain in the front, back, or sides, like the pain from which Ms. Colbert was suffering. (TR.TRA. PG. 458 L. 23 2- PG. 459 L. 5)

157. On discharge, Dr. Taylor discussed with Ms. Colbert the fact that he believed the pain she was having was related to her lungs and encouraged her to increase her deep breathing. (TR.TRA. PG. 461 L. 1 – 21)

158. Even if a cystoscopy had been done and an injury located, it is likely the repair could not have been made at the CNMC. (TR.TRA. PG. 591 L. 13 – PG. 592 L. 19)

159. Repair required equipment not available at the CNMC. (TR.TRA. PG. 591 L. 15 – PG. 592 L. 19)

160. Dr. Diacon has never done a ureteral repair at CNMC. (TR.TRA. PG. 591 L. 15 – 19)

161. Delay of one week in recognizing the injury is not below the standard of care. (TR.TRA. PG. 623 L. 17 – 21; TR.TRA. PG. 357 L. 19 – PG. 358 L. 25)

162. If the ureter is tied, there is a crush to the ureter and the ureter has been injured; that is instantaneous. (TR.TRA. PG. 302 L. 12 – PG. 303 L. 4)

163. In that very short period of time, the blood supply to that area is interrupted and the tissue is damaged. (TR.TRA. PG. 303 L. 4 – 10)

164. Once the ureter is crushed and the tissue is damaged, which happens in a very short period of time, the ureter is injured and will have to be repaired. (TR.TRA. PG. 303 L. 1-10)

165. In this case, the procedure that Dr. Diacon performed approximately one week later is the same that would have occurred if the ureter injury was recognized during the surgery. (TR.TRA. PG. 300 L. 4 – 13)

166. There was no increased difficulty in repairing the ureter due to any delay in repair. (TR.TRA. PG. 385, L. 25 – PG. 386 L. 12)

167. Dr. Diacon, who performed the repair, indicated that finding the left ureter was more difficult but once he found it, the repair was easy. (TR.TRA. PG. 614 L. 22 – PG. 615 L. 4)

168. The normal course after ureter repair is for strictures to form. (TR.TRA. PG. 298 L. 6 – 17; TR.TRA. PG. 617 L. 4 – 8; TR.TRA. PG. 393 L. 14 – PG. 394 L. 1)

169. Stricture formation is a known complication of injury to a ureter and therefore, the Defendant cannot be responsible for damages of a known complication of injury to the ureter which does not fall below the standard of care. (TR.TRA. PG. 397 L. 19 – 24)

170. If Dr. Diacon had done the repair to the ureter on the day of the original surgery in the manner he did in this case, Ms. Colbert's outcome of recurrent strictures would have been the same. (TR.TRA. PG. 383 L. 1 – 14)

171.    It is not the timing of the repair but the choice of surgical repair that caused the greater likelihood of damage in this case. (TR.TRA. PG. 383 L. 1 – 14)

172.    Dr. Diacon's choice of repair of the ureter, end to end, was below the standard of care and resulted in injury to Ms. Colbert. (TR.TR.PG. 359 L. 1- PG. 366 L. 24)

173.    The ureter is approximately 24 cm long, and this injury was very near to the bladder. (TR.TRA. PG. 401 L. 5 - 12)

174.    The injury in this case occurred three to five cm above the bladder. (TR.TRA. PG. 407 L. 13 – 22; TR.TRA. PG. 596 L. 3 – 7)

175.    The blood supply to the distal ureter in this case was impaired because it was coming from one direction, the kidney. (TR.TRA. PG. 401 L. 3 – 9; TR.TRA. PG. 404 L. 16 – PG. 405 L. 1)

176.    Reimplantation into the bladder was the repair that should have been performed. (TR.TRA. PG. 366 L. 25 – PG. 367 L. 18)

177.    The singular function of the ureter is to transmit urine from the kidney to the bladder. (TR.TRA. PG. 367 L. 2 – 8)

178.    The role of surgical repair is to restore the continuity of flow to the urinary bladder. (TR.TRA. PG. 367 L. 2 – 8)

179.    If a surgeon reattaches the ureter to the bladder there is no need to worry about the distal portion of the ureter forming stricture due to lack of blood flow. (TR.TRA. PG. 404 L. 13 – PG. 405 L.1)

180.    When a surgeon joins the ureter to the ureter both portions of the ureter are susceptible to forming strictures.  (TR.TRA. PG.  404 L. 16 – PG. 405 L. 1)

181.    To properly repair the ureter the surgeon needs to connect healthy ureter and attach it to healthy tissue, in this case the bladder (TR.TRA. PG. 367 L. 2 - 8)

182.    The distal part of the ureter was very short and therefore more likely to form strictures because the blood supply, which flows only one direction, has to come all the way down from the kidney.  (TR.TRA. PG. 404 L. 16 – PG. 405 L. 5)

183.    In effect, the blood supply in the lower distal end is farther and farther away which prohibits good blood flow resulting in strictures.  (TR.TRA. PG. 406 L. 16 – 25)

184.    Because the remaining portion of the distal ureter is so short and such a long way from the blood source (the kidney) if a surgeon attaches the small segment of the distal ureter to the proximal ureter there is a risk that instead of joining together and healing in a normal way that it will contract and scar to produce a stricture or the cells in that tissue will die. One of the two of those complications occurred to cause the strictures in this case.  (TR.TRA. PG. 366 L. 10-21)

185.    "TeLinde's Operative Gynecology" is authoritative and states "the standard repair following ureteral transection within six centimeters of the bladder is to reattach the ureter to the bladder."  (TR.TRA. PG. 178 L. 12 – PG. 182 L. 2)

## D.  Conclusions of Law

1.      Jurisdiction and Venue are proper in this Court pursuant to the Federal Tort Claims Act ("FTCA").   28 U.S.C. § 1346(b). Venue in this Court is proper and this Court has jurisdiction over the parties and subject matter in this cause to hear and determine liability and damages issues arising out of the alleged injuries sustained by Ms. Colbert pursuant to 28 U.S.C. §§ 1346(b), 2401, and 2671-2680.

2.      Pursuant to the FTCA, liability for medical negligence is controlled by the law where the alleged negligence occurred. *See Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990).   A prima facie case of medical negligence has three elements: 1) a duty owed by the defendant to protect the plaintiff from injury; 2) a failure to perform that duty; and 3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care. *Smith v. Hines*, 2011 OK 51, ¶ 12, 261 P.3d 1129, 1133.

3.      The standard of care in Oklahoma requires those engaging in the healing arts to be measured by national standards.   *Grayson v. State ex. rel. Children's Hospital of Oklahoma*, 1992 OK CIV APP 116, 838 P.2d 546, 550.

4.      Injuries to the ureter are a known complication which can occur during pelvic surgery in the absence of any negligence.

5.      Formation of strictures in the ureter following surgical repair of the ureter is a known complication of repair.

6.  The standard of care requires that an obstetrician-gynecologist make reasonable attempts to identify and protect the ureters during pelvic surgical procedures.

7.  This is done by visually identifying the ureters during dissection of the ovarian vessels at the pelvic brim, and then continuing this identification to the point at which the ureters dive under the uterine arteries near the cervix.

8.  All experts agree that injury to the ureter during the hysterectomy was a known complication even in the absence of any deviation from the acceptable standard of care.

9.  In this case there was no requirement under the appropriate standard of care to perform additional testing, either in the form of injecting dye or performing cystoscopy during the surgery.

10. Post-operatively the standard of care was met in that Dr. Taylor regularly evaluated the patient for signs and symptoms of surgical complications.

11. Dr. Taylor promptly diagnosed the ureteral injury when Ms. Colbert returned to have her staples removed.

12. Dr. Taylor immediately referred Ms. Colbert to a urologist who performed the repair of the ureter.

13. The decision by the urologist, Dr. Diacon, to reattach the ureter end to end rather than reattaching the ureter to the bladder resulted in a greater likelihood of strictures forming at the site of the repair.

14. Had Dr. Diacon reattached the ureter to the bladder it would have been less likely that these strictures would have formed.

15. The actions of Dr. Diacon in reattaching the ureter end to end was below the standard of care and resulted in strictures forming at the repair site.

16. The actions of Dr. Diacon, in repairing the transected ureter, constitute a supervening cause which breaks the causal nexus between the alleged negligent act and the resulting injury. *Thompson v. Presbyterian Hospital, Inc.*, 1982 OK 87, 652 P.2d 260, 264.

17. It was not foreseeable by Dr. Taylor that the trained urologist would repair the ureters in a manner that fell below the standard of care.

18. Therefore, the Court finds that the actions of Dr. Diacon were the proximate cause of Ms. Colbert's injuries.

19. Even if Dr. Diacon had performed the correct repair surgery, transection of the ureter during Ms. Colbert's hysterectomy and the occurrence of strictures following a ureter repair were known complications.

20. It is a known complication for strictures to form after a ureter injury, and Ms. Colbert's condition after repair of her ureter followed that normal course.

21. Ms. Colbert's ureter was damaged and required repair, but any damages suffered due to the injury to the ureter are not recoverable against the Defendant.

22. Plaintiffs have failed to prove that negligence of Dr. Taylor caused damages to Ms. Colbert. The deficiency in the evidence of negligence and causation in this case renders any testimony related to damages unnecessary.

IT IS THEREFORE ORDERED that Judgment should be entered against Plaintiffs and in favor of the Defendant.

**IT SO ORDERED** this 31st day of March, 2015.

James H. Payne
United States District Judge
Eastern District of Oklahoma